UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GENENTECH, INC., | Case No.: C 10-2037 PSG |
| Plaintiff, | **ORDER GRANTING PLAINTIFF'S MOTION TO COMPEL** |
| v. | |
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, | **(Re: Docket No. 344)** |
| Defendant. | |

Before the court is Plaintiff Genentech, Inc.'s ("Genentech") motion to compel Defendant and Counterclaim-Plaintiff The Trustees of the University of Pennsylvania ("Penn") to produce documents over which Penn has claimed attorney-client privilege. As described in the court's October 18, 2011 order requiring Penn to lodge the documents with the court for *in camera* review, the dispute involves 17 emails reflecting communications between Mark Greene ("Greene") and Charles Blitzer ("Blitzer"). Having carefully reviewed the documents *in camera* and considered the arguments and evidence presented by the parties, the court finds that Penn has not sustained its burden to establish attorney-client privilege over the emails exchanged. The court hereby GRANTS Genentech's motion to compel and ORDERS Penn to produce the 17 emails without delay, and no later than Tuesday, October 25, 2011 at 2:00 p.m.

In light of the fact that the parties have scheduled Blitzer's deposition for less than two days from today, the court will provide an abbreviated background and analysis of the pertinent facts and governing law.

Blitzer is the former President and Chief Executive Officer of a small, life-sciences startup called Fulcrum Pharmaceuticals, LLC ("Fulcrum"). Blitzer was then, and remains, a registered patent attorney. Greene is Penn's lead inventor on the patent-at-issue. Greene also held an equity interest in Fulcrum and served Fulcrum in a consultant capacity. In 2002, Penn licensed certain patent rights to Fulcrum. In declarations submitted by Penn, Greene and Blitzer refer to the emails as part of an "ongoing exchange" in which Blitzer sought information from Greene to assist him in advising Fulcrum's Board of Directors regarding the strength and potential of Fulcrum's patent portfolio.[1]

Penn therefore argues that the emails are subject to attorney-client privilege on two separate grounds: 1) Greene communicated with Blitzer in his capacity as a Fulcrum consultant and equity shareholder, making him a "functional employee," and Blitzer communicated with Greene in his attorney capacity while seeking input on the strength of the patents; and 2) Penn and Fulcrum shared a common interest privilege regarding the patent portfolios owned and invented by Penn and licensed exclusively to Fulcrum. Genentech argues that neither privilege applies because the nature of the emails related solely to business and commercial strategy regarding the patents. Genentech also argues that the so-called "common interest privilege" is not a privilege itself, but "an anti-waiver exception" that does not come into play unless the communication at issue is privileged in the first instance.

As the court described in its October 18th order, Penn voluntarily produced the emails in mid-July 2011 as part of a broader document production. Approximately two months later, Penn

---

[1] *See* Docket No. 346-2 at 1-2.

2
Case No.: CV 10-2037 PSG
ORDER GRANTING PLAINTIFF'S MOTION TO COMPEL

issued a "claw back" demand pursuant to the protective order it signed with Genentech. Penn explains that despite its scrupulous procedures to flag and withhold privileged documents, it first discovered the emails were privileged two months later while preparing Blitzer for his deposition. Penn immediately informed Genentech and demanded return or destruction of the documents pursuant to the protective order.

"Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed."[2] A communication made in confidence between an attorney and his client for the purpose of seeking or relating legal advice is protected from disclosure by the attorney-client privilege, unless the protection is waived.[3] As the party asserting the privilege, Penn must establish that Blitzer and Greene were in an attorney-client relationship during the relevant time frame *and* that their communications were for the purpose of providing and receiving legal advice.[4] In the corporate context, communications between an outside consultant and a company's corporate counsel may fall within the scope of the entity's attorney-client privilege where the consultant acts as a "functional employee" to the company.[5]

Penn argues that in addition to his role as CEO at Fulcrum, Blitzer served as in-house intellectual property counsel. It further argues that Greene, in his capacity as a consultant to and investor in Fulcrum, served as a "functional employee" who understood his communications with Blitzer to be confidential and for the purpose of analyzing and advising Fulcrum about the strength of its patents. Genentech argues that even if Blitzer acted as both CEO and attorney, his

---

[2] *United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010) (quoting *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002)).

[3] *See id.*

[4] *See id.* (quoting *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) ("A party asserting the attorney-client privilege has the burden of establishing the existence of an attorney-client relationship *and* the privileged nature of the communication.")) (emphasis in original).

[5] *See id.* at 1158-59.

communications with Greene were not privileged where "the principal purpose for making the communication" was not to secure legal advice but to secure what was "essentially a business service."[6]

It is not enough that the subject matter of the emails relates to the patents licensed to Fulcrum. In *United States v. Richey,* the court concluded that communications between an appraiser and the law firm that had retained him to provide valuation services respecting a conservation easement were not privileged because they "related to the preparation and drafting of the appraisal for submission to the IRS [and were] not made for the purpose of providing legal advice."[7] Similarly here, there must be some indication that the communications between Greene and Blitzer related to something more than Blitzer's need to secure information for the purpose of presenting a business case to the Board of Directors. The court's review of the emails has revealed no such legal purpose.

The discussions between Greene and Blitzer relating to such topics as "targets," the patent-now-in-issue, and possible competitors are directed squarely at Blitzer's need or desire to inform Fulcrum's investors of the scientific underpinnings for potential, additional commercialization opportunities and likely competition. For example, the term "targets" refers not to targets in the context of patents or licensing, but to targets on the protein/molecular level that could be pursued with additional research funding. There is no indication – aside from Greene's and Blitzer's conclusory declarations – that the discussions related to issues of patentability, prior art, or even the prosecution and enforcement potential of the licensed patent portfolios. Greene's responses to Blitzer's emails appear singularly intended to assuage concerns regarding licensing payments made

---

[6] *See In re Micropro Sec. Litig.*, 1988 WL 109973, at *2 (N.D. Cal. Feb. 26, 1988) (finding notations made by employees to corporate counsel consisted primarily of "factual information" for which no attorney-client privilege existed because "the attorneys were essentially serving as a conduit for factual data, and were not acting primarily as lawyers").

[7] *See Untied States v. Richey*, 632 F. 3d 559, 566-67 (9th Cir. 2011).

by Fulcrum and to inform Blitzer's requests for identification of other molecular targets with potential commercial applications.

Nor do the communications reveal Blitzer acting in any way as a lawyer. In fact, in the course of the email thread in dispute, Blitzer goes so far as to announce that he is "speaking as the CEO" when addressing Fulcrum's relationship with Penn. Moreover, as just explained, the content surrounding Blitzer's proclamation is demonstrative of an exchange relating to business prospects and strategy, and does nothing to suggest that Blitzer or Greene also intended the communications to assist with the rendering of legal advice.

Penn has not met its strict burden to establish that the seventeen emails are subject to the attorney-client privilege. Nor can Penn prevail on its "common legal interest" argument. It is not enough that Penn and Fulcrum may have shared a common interest in obtaining strong, enforceable patents due to the exclusive nature of the license agreements.[8] Courts apply the "common interest" privilege or doctrine only where there is a predicate, privileged communication that – but for a waiver – already meets the criteria of the attorney-client privilege. The common interest doctrine is best understood as an "anti-waiver exception" that "comes into play only if the communication at issue is privileged in the first instance."[9] The doctrine provides an exception to the waiver rule where a communication is disclosed to a third party, and the parties have a "common legal, as opposed to commercial, interest."[10] Because Penn cannot establish that these emails between Greene and Blitzer were "privileged in the first instance," the common interest doctrine has no

---

[8] *See In re Regents of the Univ. of California*, 101 F.3d 1386, 1390 (Fed. Cir. 1996) (concluding that that the "common interest privilege" applies to communications between a university patentee and a company licensee where the company attorneys "advised and consulted frequently" with university counsel and the legal interest between the company and university "was substantially identical because of the potentially and ultimately exclusive nature of the … license agreement").

[9] *See Verigy U.S., Inc. v. Mayder*, 2008 WL 5063873, at *1 (N.D. Cal. Nov. 21, 2008) (citing *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007)).

[10] *See id.* (citing *Nidec*, 249 F.R.D. at 579).

5
Case No.: CV 10-2037 PSG
ORDER GRANTING PLAINTIFF'S MOTION TO COMPEL

application here. As such, Penn's production of the emails to Genentech in July 2011 did not constitute waiver.

Penn shall produce the emails in question to Genentech without delay, and no later than tomorrow, October 25, 2011 at 2:00 p.m.

**IT IS SO ORDERED.**

Dated: October 24, 2011

*Paul S. Grewal*
PAUL S. GREWAL
United States Magistrate Judge