United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GENENTECH, INC.,<br><br>                Plaintiff,<br>     v.<br><br>THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,<br><br>                Defendant. | Case No.: C 10-2037 LHK (PSG)<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO STRIKE AND DENYING PLAINTIFF'S CROSS-MOTION TO COMPEL**<br><br>**(Re: Docket Nos. 483, 486, 502)** |

In this patent infringement action, Defendant and Counterclaim-Plaintiff The Trustees of the University of Pennsylvania's ("the University") contends that well after the close of discovery, Plaintiff Genentech, Inc. ("Genentech") improperly produced a set of emails related to a series of unconsummated settlement discussions that took place between the parties in 2004 ("2004 communications"). The University moves to strike the "settlement emails" and the portions of Genentech's expert damages report that reference those emails. The University offers two independent grounds for striking the 2004 communications: (1) the emails are inadmissible to prove Genentech's damages case under Fed. R. Evid. 408; and (2) the parties agreed not to produce evidence relating to settlement discussions – or Genentech waived any objection to the University's decision not to produce such documents – and the University will be prejudiced if forced to address new discovery at this point in the case.

1

Case No.: C 10-2037 LHK (PSG)
ORDER

Genentech contends not only that its production was proper, having discovered the emails immediately prior to their production, but that the University improperly withheld the emails and related documents during the course of fact discovery. According to Genentech, the 2004 communications represent important evidence concerning the University's valuation of the '752 patent as expressed during licensing negotiations and before any threat of litigation had emerged, and therefore do not fall within the scope of Fed. R. Evid. 408. Genentech opposes the motion to strike and further asks the court to compel the University to produce the missing documents.[1]

The parties appeared for hearing on March 6, 2012.

## I. DISCUSSION

Absent an agreement to the contrary or an applicable exclusion pursuant to the rules of evidence, the documents in question would be discoverable under the broad definition of relevance set forth by the federal rules and the Federal Circuit's substantial pronouncements in recent years on reasonable royalty valuations.[2] The parties' obligation to have produced the documents, and Genentech's right to rely on them for its damages case, thus turns on whether either of these exceptions apply to the 2004 communications.

### A. Fed. R. Evid. 408

Under Rule 408, a party cannot use "conduct or a statement made during compromise negotiations" about a disputed claim "either to prove or disprove the validity or amount of [the] claim." The University argues that the 2004 communications were made during "compromise negotiations" between the parties regarding Genentech's potential infringement of the '752 patent. Even if the emails were exchanged before the University formally alerted Genentech to its purported infringement of the '752 patent, the University contends that the 2004 communications

---

[1] Genentech filed its opposition as an opposition and cross-motion to compel. *See* Docket No. 486. As discussed below, Genentech's motion comes several months after the November 1, 2011 close of fact discovery in this case. Normally under the court's June 7, 2011 discovery order that sets forth the letter briefing procedure, no reply briefs are to be considered. *See* Docket No. 262 (Order Shortening Time). Because Genentech included a cross-motion in its response, in this instance the court will consider the University's reply letter brief.

[2] *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009) (describing the "hypothetical negotiation" approach to approximate the royalty to which a willing licensor and willing licensee would have agreed at the time the infringement began).

2
Case No.: C 10-2037 LHK (PSG)
ORDER

fell within the scope of a confidentiality agreement between the parties that was drawn up several years earlier.[3] That agreement stated that discussions between Genentech and the University involving Herceptin "shall be treated for all purposes as compromise and settlement negotiations within the meaning of Rule 408 of the Federal Rules of Evidence and Section 1152 of the California Evidence Code."[4]

Genentech does not dispute that, in support of its effort to undercut the University's damages demand, it has referenced the amount quoted by the University in the 2004 communications as part of a licensing proposal for the '752 patent.[5] Genentech's Elsten Report references the offer revealed in the 2004 email exchange as the amount that the University "appears to have proposed" as a paid-up royalty to license the '752 patent, and Genentech's response to that proposal.[6] In a footnote, Elsten states that "[w]hile this UPenn offer is revealing, if I were not to consider it, my opinions would not change."[7] Yet in its opposition to the University's motion, Genentech argues that because there was no "disputed claim" regarding the '752 patent at the time of the 2004 communications, the emails fall outside the scope of Fed. R. Evid. 408.[8] In 2004, Herceptin had not been approved for adjuvant therapy and therefore could not serve as the basis for an alleged infringement claim.[9] Genentech further argues that the University's proffer of the earlier

---

[3] *See* Docket No. 483, Ex. D (under seal). The agreement did not offer a particular time frame, other than to reference the date of the first licensing discussion and those to be held "from time to time thereafter." *Id.*

[4] *See id.* The court has sought to refrain from revealing any material marked as highly confidential.

[5] *See* Docket No. 486 at 1 (Pl.'s Opp'n to Mot. To Strike).

[6] Docket No. 483-1 (Wells Decl.), Ex. C at 69 (Opening Expert Report and Disclosure of Cate M. Elsten: 2/6/2012).

[7] *Id.*, Ex. C at 69 n. 390.

[8] *See Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1557 (Fed. Cir. 1983) ("Rule 408, on its face, is limited to actual disputes over existing claims and, accordingly, cannot be applicable to an offer, albeit one ultimately rejected, to license an, as yet, uncontested patent.").

[9] Genentech points out that even the University's damages expert opines that Genentech's alleged infringement began about two years later when the FDA approved Herceptin for adjuvant use. *See* Docket No. 486 (Levine Decl.), Ex. 2 ¶ 38.

3
Case No.: C 10-2037 LHK (PSG)
ORDER

confidentiality agreement is unavailing because it is unexecuted[10] and thus not binding, and was entered in relation to a different set of license negotiations between the parties several years before the 2004 communications began.

Insofar as Genentech's reference in the Elsten Report is for the purpose of either proving or disproving the validity or amount of the claim in dispute, it falls squarely within the scope of Rule 408. It does not appear, however, that the emails produced by Genentech made up "compromise negotiations about the claim" in dispute, within Rule 408's meaning. As in *Deere & Co.*, there is no evidence that the 2004 licensing proposal related to a disputed claim, especially in light of Genentech's response at the time, which explained that Herceptin was not then in development in preventive indications.[11] Without more, the fact that the University reached out to Genentech in 2004 regarding the '752 patent "covering the use of Herceptin to prevent breast cancer" is insufficient to qualify those discussions as "compromise negotiations."

Similarly, the confidentiality agreement originated several years before the 2004 communications and arose in the context of licensing negotiations around a different University patent in relation certain antibody products, "including Herceptin."[12] There is no evidence that the parties intended for this single-paragraph, broadly-termed confidentiality agreement to apply to discussions initiated around separate intellectual property over five years later. On the record presented, the court concludes that the 2004 communications are not clearly "compromise negotiations" on a disputed claim within the meaning of Rule 408 or within the scope of the confidentiality agreement.

---

[10] The copy of the confidentiality agreement proffered by the University is signed only by Genentech.

[11] Although the parties in *Deere & Co.* agreed that there was no infringement of one of the patents-in-issue at the time of the licensing negotiations in question, the court independently noted that "the past dealings between [the parties] were such that an eventual court battle involving the [] patent was an acknowledged possibility or even probability. Nevertheless, Rule 408, on its face, is limited to actual disputes over existing claims and, accordingly, cannot be applicable to an offer, albeit one ultimately rejected, to license an, as yet, uncontested patent." *Deere & Co.*, 710 F.2d at 1556-57.

[12] *See* Docket No. 486, Ex. 9 (under seal).

4

Case No.: C 10-2037 LHK (PSG)
ORDER

**B.     Agreement and Waiver**

During the course of this lawsuit, the parties engaged in extensive fact discovery and conferred regarding the production of materials related to their earlier license negotiations. Initially, both parties sought production of materials relating to license negotiations.[13] Genentech ultimately served several requests for production that implicated licensing documents.[14] Genentech argues that the University agreed to respond to these requests and never objected that the requested documents were settlement-privileged.[15] Genentech also argues that it clearly conveyed its position in a September 20, 2011 letter to the University that it expected "documents reflecting license negotiations and communications … for all '752 Patent licenses," and was prepared to produce reciprocal material relating to its two licenses with the University.[16] Finally, Genentech argues that any prejudice at this point is to Genentech, based on the relevance of the parties' prior discussions relating to the '752 patent and of earlier valuations of the '752 patent. Genentech suggests that it would be willing to reach a "reasonable accommodation" and permit the University to serve supplemental expert damages reports that take into consideration the 2004 communications, after the University produces the missing material.

The University responds by pointing to its October 5, 2011 letter to Genentech in which it reiterated its earlier position that "it is overly burdensome to collect, review, log, and process all of the communications underlying negotiations relating to [the '752 Patent licenses]," as well as "documents relating to unconsummated licensing negotiations between the University and Genentech relating to the '752 patent."[17] The October 2011 letter also stated that "the parties

---

[13] *See id.*, Ex. 6 (email exchange wherein both parties agreed to some "reciprocal" license production) (under seal). The court understands this exchange to refer to executed licenses.

[14] Genentech's RFP 39 asked for documents relating to "licensing negotiations, or offers or attempts to license the '752 Patent." RFP 115 requested documents concerning "UPenn's valuation of the '752 patent; and RFP 119 requested documents concerning "any attempts or efforts to license the '752 Patent, including … correspondence with actual or potential licensees." *See id.*, Exs. 3, 1 (Eighth and First Set of Requests for Production).

[15] *See id.*, Exs. 4, 5 (The University's response to Genentech's RFPs 39, 115, and 119).

[16] *See id.*, Ex. 6 (Email from counsel for Genentech to the University: 9/20/2011).

[17] Docket No. 483. Ex. G (Letter from the University to Genentech: 10/6/2011).

5
Case No.: C 10-2037 LHK (PSG)
ORDER

previously agreed that such materials would be 'treated for all purposes as compromise and settlement negotiations within the meaning of Rule 408'" such that the production of ultimately inadmissible material would create "an unnecessary burden."[18] The University contends – and Genentech does not dispute – that although some documents may have been produced earlier relating to negotiations between the parties, no further production took place. Also, Genentech never questioned the University's position regarding the non-production of unconsummated licensing negotiation documents between the parties relating to the '752 patent.[19]

The University's unilateral statement that the production of documents relating to the parties' unconsummated license negotiations was burdensome and unnecessary based on inadmissibility is insufficient to demonstrate an express agreement between the parties to refrain from completing this production. Yet it is untenable that Genentech waited months to respond to the University's letter or dispute its position, or to further pursue the production of documents referenced in Genentech's September letter relating to '752 patent negotiations. Not until January 17, 2012, when Genentech sent a letter to the University stating that it had discovered responsive documents "while performing a search for an unrelated litigation matter" and that the documents "suggest that Penn may not fully complied [sic] with its discovery obligations," did Genentech pursue production of documents relating to the 2004 negotiations.[20] Genentech may be correct that a party does not waive its right to compel simply because it was unaware until after the close of fact discovery that its adversary was improperly withholding relevant documents. But in this case, Genentech itself had access to the same documents, in addition to related documents from January

---

[18] *Id.*

[19] Genentech points to several documents produced by the University that relate to the parties' licensing negotiations. *See, e.g.*, Docket No. 486, Ex. 7 (Jan. 2005 "Partnership Proposal"); Ex. 8 (Letter regarding January 2005 negotiation: 1/27/2005). In its reply, the University responds that these documents were produced in July 2011, several months before the University's October 2011 letter explaining that it would not produce unconsummated negotiation documents. The University also notes that consistent with its position, it has not relied upon those documents in expert reports on damages and willfulness. Although Genentech disputes this representation, that dispute is not currently before the court.

[20] *See* Docket No. 483. Ex. A (Letter from the Genentech to the University: 1/17/2012).

6

Case No.: C 10-2037 LHK (PSG)
ORDER

2005, as well as the written exchanges between counsel regarding the production of these very same documents. Particularly when the documents were found on the computer of Genentech's General Counsel, an individual whose direct responsibility in this case is so substantial that he is entitled under the Protective Order to review sensitive University documents, and no declaration or other evidence regarding the sudden discovery of the documents is supplied, the court is not persuaded that Genentech was sufficiently diligent.

In sum, Genentech has not shown good cause, pursuant to Civ. L.R. 37-3, for its extensive delay in filing its motion to compel. Similarly, in light of Genentech's failure to follow up on the parties' communications regarding negotiation documents and its access to the documents itself, the few references in Genentech's Elsten report to the 2004 negotiations shall be stricken.[21]

## II. CONCLUSION

For the reasons set forth above, the University's motion to strike is hereby GRANTED and Genentech's motion to compel is DENIED.

Dated: 5/8/2012

PAUL S. GREWAL
United States Magistrate Judge

---

[21] Because the report claims to arrive at the same conclusion without the existence of the 2004 communications, Genentech suffers little prejudice by not being able to rely on it.

7

Case No.: C 10-2037 LHK (PSG)
ORDER